IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

HYPERLOGISTICS GROUP, INC.,    :
    :
    Plaintiff,    :    Case No. 05-CV-728
    :
    v.    :    JUDGE ALGENON L. MARBLEY
    :
KRATON POLYMERS U.S. LLC,    :    Magistrate Judge King
    :
    Defendant.    :

## OPINION AND ORDER

### I.  INTRODUCTION

This matter is before the Court on the parties' cross-motions for summary judgment.  On January 6, 2006, Plaintiff, Hyperlogistics Group, Inc. ("Hyperlogistics" or "Plaintiff"), moved this Court for partial summary judgment on the issue of liability with respect to Counts One and Two in their complaint.  On February 16, 2006, Defendant, Kraton Polymers U.S., LLC ("Kraton" or "Defendant"), moved this Court for summary judgment on all of Plaintiff's claims and its own counterclaim.  For the reasons stated herein, this Court **GRANTS** in part and **DENIES** in part Plaintiff's Motion for Partial Summary Judgment.  Additionally, this Court **GRANTS** in part and **DENIES** in part Defendant's Motion for Summary Judgment.

### II.  BACKGROUND

#### A.  Facts

On July 1, 1991, Shell Chemical Company ("Shell") entered into a Warehousing Agreement (the "Agreement") with Transdistribution/WV, Inc. ("Transdistribution") for receipt, storage, handling, and shipment of Shell's polymer products at Transdistribution's warehouse

facility located on Rosemar Road in Vienna, West Virginia.  Schedule A to the Agreement

("Schedule A") sets forth the various fees Transdistribution charged Shell for handling, labor,

and storage.  Schedule B to the Agreement ("Schedule B") sets forth a list of service standards

the Agreement required Transdistribution to satisfy.[1]  Under Article 2 of the Agreement,

Transdistribution agreed to provide "the necessary equipment, facilities, space, manpower,

administration/office support and services according to but not limited to the attached Schedule

B, . . . for receiving, transferring, and storing products consigned by Shell to the care of

[Transdistribution] and for performing quality inspections and shipping the products from

storage when and as specified by Shell."

The Agreement was effective for a term of ten years, beginning on the signing date,[2] and

beyond the initial ten-year term, it gave Shell the option of obtaining one-year extensions.[3]  In

2000, Shell assigned its interests under the Agreement to an entity that later was renamed

Kraton.  Transdistibution later transferred its interests under the Agreement to Hyperlogistics.[4]

---

[1]Included among the service standards in Schedule B is a provision stating that
"[f]acilities should be maintained in such a manner to reduce risk of loss, damage or
contamination to [Defendant's] product, equipment or packaging materials."  Schedule B at
IV(D).

[2]The original term ended on July 1, 2001.

[3]Pursuant to Article 3(B) of the Agreement, "[e]ach one (1) year extension shall occur
automatically unless Shell gives to [Transdistribution] written notice of intent to terminate at
least twelve (12) months prior to the end of each term."  The contracting parties or their
assignees twice extended the Agreement by formal, written amendment; the first amendment
extended the Agreement through February 29, 2004, and the second amendment extended it
through February 28, 2005.

[4]Plaintiff maintains that Transdistribution was merged into Hyperlogistics, effective
January 1, 2005.  Defendant, however, asserts that the warehouse operated under the name
"Hyperlogistics" in early 2004.  The Court need not identify the precise date when
Transdistribution's interests under the Agreement were transferred to Hyperlogistics because

Accordingly, for clarity, the Court hereafter will regard the parties to the Agreement as Plaintiff and Defendant.

Pursuant to Article 15 of the Agreement, West Virginia state law governs any disputes arising under the Agreement.

<u>1.  Cancellation Procedures Under the Agreement</u>

Article 3(C) of the Agreement provides the procedure for terminating Plaintiff's handling obligations (the "handling services component"), as distinguished from Plaintiff's warehousing obligations (the "warehouse services component"), under the Agreement.  It provides:

> The Handling provision of this Agreement may be cancelled during the term of this contract by [Defendant] when service standards, as outlined in the attached Schedule B, are not being met.  The cancellation procedures shall be:
>
> 1.  Written notice listing specific service standards not being met shall be delivered by [Defendant] to [Plaintiff] according to paragraph fourteen (14), "Notices."[5]
>
> 2.  On receipt of notice listing service standards not being met, [Plaintiff] has sixty (60) days to issue and implement a corrective action plan.  If after sixty (60) days the service standards are not corrected, [Defendant] may give [Plaintiff] a three (3) month written notice of intent to terminate the Handling provisions of this Agreement.  The termination shall take effect three (3) months after receipt of the notice.  During this three (3) month period, [Plaintiff]

_____

that issue is irrelevant for the purposes of resolving the parties' claims in this case.

[5]The Court presumes that this provision references Article 14 of the Agreement ("Article 14"), titled "Notices," not paragraph fourteen.

Article 14 provides that "[a]ny notice, hereunder, addressed to the party for whom it is intended at the address authorized by such party, shall be considered good and valid notice hereunder, effective from date of mailing."  That Article goes on to provide the mailing addresses of the original parties to the Agreement, Shell and Transdistribution, as well as their respective Telex, fax, and TWX numbers.

will continue to provide normal services as outlined in this contract.

3.  This [Agreement] shall become a rental agreement between [Defendant] and [Plaintiff], when the Handling provision of this Agreement has been cancelled. . . . [Defendant] shall pay [Plaintiff] an agreed to monthly rental fee not to exceed $60,000 per month.

4.  Other fees and terms shall be negotiated during the three months following the receipt by [Plaintiff] of the written notice of intent to terminate the Handling provision.

Additionally, Article 7(C) of the Agreement provides the following:

For the purposes of determining the monthly storage charge, [Plaintiff's] monthly storage guarantee will not apply during any period after written notice of intent to cancel this Agreement under Article 3 (Term of Agreement), Paragraph C, is received by either party, the charge will be determined by actual net product inventoried thereby eliminating the minimum monthly storage charge of $60,000 derived by applying the Schedule A storage rate to 30 million net pounds of product.

### 2.  Responsibility for Loss, Damage, or Contamination of Defendant's Products Under the Agreement

The Agreement further provides that Plaintiff shall be held financially liable for certain damages to Defendant's products.  In particular, Article 5(A) states:

[Plaintiff] shall be responsible:  (a) for loss of, damage to, or contamination of [Defendant's] Products, equipment and packaging materials occurring during the receipt, unloading, storing, handling, transferring, or loading thereof in the performance of this Agreement, provided that such loss, damage or contamination results from failure of [Plaintiff], its' employees, agents, or contractors, to exercise the degree of care in regard to such products, equipment and packaging materials that a reasonably careful person would exercise under the circumstances; [and] (b) for all loss of, damage to, or contamination of [Defendant's] products occurring during the performance of this Agreement, to the extent said products are covered by insurance, other than warehouseman's legal liability insurance, purchased by [Plaintiff],

4

whether or not such loss or damage has resulted from the failure of
[Plaintiff], its' employees, agents, or contractors, to exercise the
degree of care specified in subparagraph (a), above. . . .

### 3.  Defendant's Actions to Cancel the Agreement

According to Defendant, beginning in 2002, the condition of Plaintiff's warehouse began

to decline, and Plaintiff's inventory and recordkeeping practices became disorganized.  During a

series of meetings between July 1, 2003 and August 12, 2003, representatives from Plaintiff and

Defendant met to discuss Plaintiff's alleged unsatisfactory performance.  Subsequently, Plaintiff

presented to Defendant its remedial plan to address the deficiencies Defendant had identified.

On March 25, 2004 and April 2, 2004, Defendant conducted audits of Plaintiff's

warehouse.  In the audits, Defendant discovered additional issues regarding the warehouse's

maintenance and condition.  For example, the auditors found entire rows of product damaged or

ruined by moisture and standing water, products crushed due to improper stacking, punctured

and leaking products, and products spilled onto the warehouse floor.  Defendant provided

Plaintiff with the auditors' written reports, and on April 12, 2004, Sherri Bartimus ("Bartimus"),

one of Plaintiff's employees, responded to Defendant by submitting a "Hyperlogistics

Warehouse Audits Plan of Action," which sought to correct flooding and re-stacking issues.

On April 27, 2004, John Branch ("Branch"), Defendant's national logistics manager,

sent[6] a letter to Seatta Layland ("Layland"), Plaintiff's President, requesting additional corrective

action and "root cause analysis" by Hyperlogistics.  In the letter, Branch identified the problem

standing water posed to Defendant's products and provided instructions on how to avoid

---

[6]The parties agree that this correspondence was set via e-mail.  Defendant asserts that it
was also sent by regular mail, but Plaintiff argues that there is no competent evidence to support
that position.

damaging Defendant's product by decreasing levels of humidity in the warehouse.  Branch's

letter, in part, stated:

> The excessive damage to pallets, boxes, bags, and lack of centering
> pallets during warehouse handling all relate back to employee
> attitude and an atmosphere of quality expectations.  All the
> warehouse staff need to be informed that rough handling of the
> pallets will not be tolerated.  Care is to be exercised when moving
> and stacking the pallets and that is a minimum expectation.  If a
> high level of expectations is set forth by management, then
> employees will rise to that level.  We consider this to be a major
> issue at [the warehouse] today.

Layland responded to this letter by e-mail on May 5, 2004, stating that Defendant's observations

were "well founded."  With respect to the standing water issue, Layland responded:

> All of the standing water observed during your inspections was due
> to seepage through the exterior wall. . . .  This condition readily
> worsened last year.  This is probably due to deterioration of the
> exterior painted surface.  A contractor was secured to correct the
> problem but failed to complete his program.  We are completely at
> fault for not forcing [a] more timely solution.

In response to Defendant's other statements, Layland noted:

> Excessive damage to your product is inexcusable and will never
> happen again.  The entire warehouse staff and the management of
> these companies, is deeply embarrassed that conditions had
> deteriorated to the point [where] product integrity was
> compromised.  We collectively believe that this was not due to a
> lack of management's high expectations.  Hopefully, we believe it
> was due to staff shortages, high activity and not adequate
> marshalling of our resources to maintain quality standards.  We are
> also firmly convinced that none of us were paying attention to
> conditions and opportunities for improvement.

On June 2, 2004, Bill Reinke ("Reinke"), one of Defendant's employees, e-mailed

another letter to Layland and Geoff Manack ("Manack"), Plaintiff's Vice-President, detailing

aspects of the warehouse that were still inadequate.  In the e-mail, Reinke commented that "the

6

problems we found, especially with customer orders, indicate that simple guidelines are still not

being executed." On June 16, 2004, Bartimus responded by e-mail to Reinke, Branch, and some

other Kraton employees that "upon your next audit, you will find that the conditions at our

facility will meet [Kraton's] requirements." Bartimus assured Defendant that Plaintiff had

implemented additional corrective actions to resolve Defendant's concerns.

On August 25, 2004, Defendant concluded another inspection of Plaintiff's warehouse,

and again, it was dissatisfied with the warehouse's handling of Defendant's product.[7]

After reviewing the results of the August 2004 inspection, Branch mailed a letter to

Layland, dated November 9, 2004, to inform Plaintiff of Defendant's intent to cancel the

handling provision and terminate the Agreement (the "Termination Letter"). The final three

paragraphs of the Termination Letter state:

> Since 2003, we have provided Hyperlogistics with numerous
> written and verbal notices of performance and service problems.
> These notices have been acknowledged and corrective action plans
> were prepared, submitted, and supposedly implemented. KRATON
> has given Hyperlogistics over fifteen months to correct the service
> and performance problems since the original August 2003
> corrective action plan was submitted, yet serious service problems
> continue.
>
> The service standards, as required in Schedule B of the
> [Agreement], dated July 1, 1991, have not been met, therefore
> KRATON must now invoke the termination provisions of Article
> 3C and 7C of the Warehousing Agreement and give notice of our
> intent to terminate this Agreement effective February 11, 2005.

---

[7]According to Defendant, the inspection revealed that, "of the roughly 700 units of
KRATON product stored at the warehouse, over 500 units were damaged and in need of repair."
Additionally, Defendant contends that, out of 146 units inspected on July 29, 2004 alone, 86
units were damaged and in need of repair, and 54 units were unacceptable for customer shipment
under any condition.

> In addition, pursuant to Article 5 of this Agreement, we hereby
> submit a claim for damages in the amount of $254,953.15. The
> details of the claim are set forth in Attachment B [to this letter].
> We suggest that KRATON be issued a credit for services to be
> provided in accordance with Article 7(c) during the remaining three
> (3) months of the Agreement as partial payment of the claim.

Defendant continued to pay its storage fees to Plaintiff until it had arranged for the removal of all

of its product from Plaintiff's warehouse, which occurred prior to February 28, 2005.

Thereafter, Defendant ceased any payments to Plaintiff.

### B. Procedural History

Based on the foregoing series of events, Plaintiff filed a complaint against Defendant and

others[8] in the Court of Common Pleas for Franklin County, Ohio on June 30, 2005 (the

"Complaint"). The Complaint alleges four claims for relief against Defendant: (1) that

Defendant breached the handling services component of the Agreement ("Count One"); (2) that

Defendant breached the warehouse services component of the Agreement ("Count Two"); (3)

that Defendant is liable to Plaintiff for $253,279.38 on account; and (4) that Plaintiff is entitled

to a declaratory judgment that Defendant has failed to terminate the Agreement in any respect.[9]

Defendant removed this action to federal court on the basis of diversity jurisdiction on

July 28, 2005.[10] On September 6, 2005, Defendant filed an answer to the Complaint and asserted

a counterclaim, which alleges that Plaintiff is liable to Defendant under the Agreement for

---

[8]Plaintiff's complaint also names 25 John Doe defendants.

[9]Plaintiff also alleges a fifth claim against the 25 John Doe defendants for tortious interference with contractual relations.

[10]This Court has jurisdiction over the subject matter because the amount in controversy exceeds $75,000, Plaintiff is an Ohio corporation, and Defendant is not an Ohio citizen. *See* 28 U.S.C. § 1332.

damages to Defendant's product (the "Counterclaim").

On January 6, 2006, Plaintiff filed a Motion for Partial Summary Judgment on Counts One and Two of the Complaint ("Plaintiff's Motion"). Defendant timely filed a Memorandum in Opposition to Plaintiff's Motion, and Plaintiff filed a Reply Memorandum.

On February 16, 2006, Defendant filed a Motion for Summary Judgment on all of Plaintiff's claims against Defendant and on the Counterclaim ("Defendant's Motion"). Plaintiff timely filed a Memorandum in Opposition to Defendant's Motion, and Defendant filed a Reply Memorandum.

Accordingly, the parties' cross-motions for summary judgment are ripe for decision.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). In response, the non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993) (citations omitted).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The Court also must interpret all reasonable inferences in the non-movant's favor.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the non-moving party and must refrain from making credibility determinations or weighing the evidence).  The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; however, there must be evidence from which a factfinder reasonably could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (finding summary judgment appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

Finally, when parties file cross-motions for summary judgment, "the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."  *Parks v. LaFace Records*, 329 F.3d 437, 444–45 (6th Cir. 2003) (quoting *B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001).

## IV.  ANALYSIS

Pursuant to Article 15 of the Agreement, West Virginia law governs the substantive issues in this matter.  Under well settled West Virginia law, "[w]hen a written contract is clear and unambiguous its meaning and legal effect must be determined solely from its contents and it will be given full force and effect according to its plain terms and provisions."  *Capitol Chrysler-Plymouth, Inc. v. Megginson*, 532 S.E.2d 43, 48 (W. Va. 2000) (quoting *Kanawha Banking and Trust Co. v. Gilbert*, 46 S.E.2d 225 (W. Va. 1947)).

## A.  Count One

Plaintiff argues that it is entitled to partial summary judgment on the issue of liability in Count One because Defendant's attempt to cancel the handling services component of the Agreement was defective.  In particular, Plaintiff contends that Defendant failed to comply with Article 3(C)(1)[11] and Article 3(C)(2)[12] of the Agreement before it sent the Termination Letter.  According to Plaintiff, Defendant never sent by regular mail[13] any written notice listing specific service standards not being met.  Because Defendant did not send effective notice prior to the

---

[11]Article 3(C)(1) of the Agreement states, "[w]ritten notice listing specific service standards not being met shall be delivered by [Defendant] to [Plaintiff] according to [Article] [F]ourteen (14), 'Notices.'"

[12]Article 3(C)(2) of the Agreement provides:

> On receipt of notice listing service standards not being met, [Plaintiff] has sixty (60) days to issue and implement a corrective action plan.  If after sixty (60) days the service standards are not corrected, [Defendant] may give to [Plaintiff] a three (3) month written notice of intent to terminate the Handling provisions of this Agreement.  The termination shall take effect three (3) months after receipt of the notice.  During this three (3) month period, [Plaintiff] will continue to provide normal services as outlined in this contract.

[13]Under Plaintiff's interpretation of the Article 14, notice must be sent by regular mail.

11

Termination Letter,[14] Plaintiff contends that Defendant did not afford it the sixty-day cure period specified in the Agreement to allow it an opportunity to correct any alleged deficiencies. Therefore, Plaintiff argues that Defendant's attempt to cancel the handling services component of the Agreement failed, and Defendant is liable to Plaintiff for breach of contract.

Defendant counters that it complied with the notice and cancellation provisions within Article 3 of the Agreement. Defendant argues that it sent to Plaintiff three written notices identifying service standards that Plaintiff was not meeting: (1) the March 25, 2004 and April 2, 2004 written audit reports; (2) the April 27, 2004 letter from Branch to Layland; and (3) the June 2, 2004 letter from Reinke to Layland and Manack. Defendant contends that each of these notices is consistent with Article 14 because that Article does not require expressly that notices be sent through regular mail.[15] Furthermore, Defendant maintains that each of these communications notified Plaintiff of specific service standards not being met.[16] In the alternative, Defendant argues that, even if its notices were defective under Article 14, Plaintiff waived any alleged defects in those notices when it responded directly to each written communication.

---

[14]Plaintiff does not challenge the form or the method of delivery for the Termination Letter.

[15]Defendant submits that the language used in Article 14 merely provides that, if the notice is sent by regular mail, it is effective upon the date of mailing. According to Defendant, Article 14 should not be interpreted as a requirement for notice by regular mail because the Article also provides the original contracting parties' Telex, fax, and TWX numbers. Therefore, Defendant concludes that its notice by e-mail communication satisfies Article 14.

[16]While Defendant concedes that none of the service standards it addressed in its communications with Plaintiff were included expressly in Schedule B, it notes that Schedule B is not an exhaustive list of service standards. Agreement, at Art. 2 ("[Plaintiff] shall provide the necessary equipment, facilities, space, manpower, administration/office support and services according to *but not limited to* the attached Schedule B . . .") (emphasis added).

Plaintiff contends that Defendant's three separate e-mail communications between April 2004 and June 2004 do not qualify as notices under the Agreement because they were not sent by regular mail in accordance with Article 14.  Defendant maintains that the e-mail communications constitute effective notices.  Other federal district courts have ruled that, when a contract specifies a method for delivery of notice, the parties must comply with it.  *See, e.g., Teragram Corp. v. Marketwatch.com, Inc.*, 2004 WL 3086883, at *5 n.7 (D. Mass. Dec. 29, 2004) (finding e-mail notice ineffective when an agreement specified that all notices must be delivered by "personal delivery, certified mail, return receipt requested, or by commercial overnight courier"); *Telular Corp. v. Mentor Graphics Corp.*, 293 F. Supp. 2d 843, 845 (N.D. Ill. 2003) (finding that a buyer's e-mails to a seller discussing problems in the development of the product did not comply with the buyer's contractual obligation to provide a 30-day notice of any non-conforming performance before terminating the contract, where the contract required that notice be delivered by hand or by registered or certified mail); *Luxottica Group S.p.A. v. Bausch & Lomb, Inc.*, 160 F. Supp. 2d 545, 551 (S.D.N.Y. 2001) (finding a faxed note to be insufficient notice when an agreement provided that proper notice of default must be sent "by overnight carrier"); *Prudential Carolinas Realty v. Cambridge Dev. Corp.*, 872 F. Supp. 256 (finding notice insufficient when it did not comply with contractual provision mandating that "notices shall be personally delivered or mailed in a sealed wrapper by United States registered or certified mail, return receipt requested, postage prepaid or delivered to a courier who guarantees overnight delivery").

In this case, the Court finds that Article 14 does not state clearly that all notices must be sent by regular mail.  Article 14 merely provides that "[a]ny notice, hereunder, addressed to the

party for whom it is intended at the address authorized by such party, shall be considered good

an valid notice hereunder, effective from date of mailing."  Article 14 goes on to provide the

mailing addresses for each of the original parties to the Agreement, Shell and Transdistribution.

Noticeably absent from Article 14, or anywhere else in the Agreement for that matter, is any

language that mandates a method for delivery of notices.  Unlike the contracts at issue in

*Teragram*, *Telular*, *Luxottica*, and *Prudential*, which each expressly provided detailed

procedures for delivering notices, the Agreement is silent regarding how the parties should

deliver notices.  At most, the language in Article 14 simply states that notice will be effective on

the date it is sent.  If the Court adopted Plaintiff's interpretation of Article 14, it would create

additional contractual obligations on the parties that the original contracting parties may have

never intended.  The Court is reluctant to take such a position.  Therefore, the Court finds that

the Agreement does not require notices to be sent by regular mail, and that Defendant's e-mail

communications have been delivered properly under the Agreement.

Next, Plaintiff argues that Defendant's notices were deficient and ambiguous

substantively, relying upon the West Virginia Supreme Court decision in *Iafolla v. Douglas*

*Pocahontas Coal Corp.*, 250 S.E.2d 128 (W. Va. 1978).[17]  In *Iafolla*, a commercial lease

---

[17]Plaintiff's argument also relies upon cases from other jurisdictions.  *See Colony Square Co. v. Prudential Ins. Co. of Am.*, 843 F.2d 479, 481 (11th Cir. 1988) ("If a party does not comply with [a] contract's default clause, it forfeits its rights under the clause.  Accordingly, when a default clause contains a notice provision, it must be strictly followed, and summary judgment is warranted if notice is not given.") (citations omitted); *RBFC One, LLC v. Zeeks, Inc.*, 367 F. Supp. 2d 604 (S.D.N.Y. 2005) (finding that various e-mail communications were defective notices of breach because they did not use the word "breach," they did not state that defendants were acting unreasonably, they were not addressed to the correct individuals, and they were not sent return receipt requested); *Telular*, 293 F. Supp. 2d at 845 (finding that various e-mails did not constitute notice of breach when, among other things, they did not discuss a breach or the possibility for cure); *see also Maloney v. Madrid Motor Corp.*, 122 A.2d 694, 696

provided that the lessor could terminate the lease if the lessee failed to keep certain equipment appurtenant to the leasehold in good repair, although the lease also required the lessor to give the lessee thirty days notice of any breach "so that the lessee could take corrective measures." 250 S.E.2d at 135. Instead of providing the thirty-day notice, the lessor simply terminated the lease. *Id*. The court held that the lease could not be cancelled for failure to keep the equipment in repair "absent a notice conforming to the terms of the lease affording the lessee an opportunity to cure any breaches[.]" *Id*. at Syllabus ¶ 4.

Here, the Court must determine whether the substance of Defendant's written communications satisfies the notice requirements in the Agreement. According to Defendant, Article 3(C)(1) of the Agreement merely required it to "provide written notice that Plaintiff's performance under the Agreement was not meeting applicable service standards." Defendant indicates that the Agreement did not require Defendant to state directly that Plaintiff was in breach, threaten overtly to terminate the Agreement, or reference expressly Schedule B.[18] Nonetheless, the Court finds that the notice, to be valid and effective substantively, at least should have contained sufficient information to make Plaintiff aware that Defendant was invoking the notice-and-cure provision in Article 3(C)(2) of the Agreement. The Court finds this to be an objective, factual inquiry, and that it cannot resolve such an inquiry at this stage of the litigation.

---

(Pa. 1956) ("The general rule is that notice for the termination of a contract must be clear and unambiguous, and where the conduct of one having the right to terminate is ambiguous, he will be deemed not to have terminated the contract.");

[18]Plaintiff concedes that no magic words were required to make notice valid and effective.

Defendant then argues that if its "notices" were defective, Plaintiff waived those defects when it acknowledged receipt of the written communications and responded to each of them with corrective action plans.[19]  "As a general matter, '[i]n order to support estoppel or waiver, a party must have been induced to rely on certain facts, and must have done so to his detriment.'" *Am. Hardware Mut. Ins. Co. v. BIM, Inc.*, 885 F.2d 132, 138 (4th Cir. 1989) (quoting *Mundy v. Arcuri*, 267 S.E.2d 454, 456–57 (W. Va. 1980)).  Therefore, "a party alleged to have waived its rights must contemporaneously have known of the circumstances giving rise to a breach of the underlying contract." *Id.*  In this case, Defendant fails to meet its burden to prove this affirmative defense.  The only evidence Defendant offers in support of its waiver theory is the three written communications Plaintiff sent to Defendant in response to Defendant's written communications.  None of those documents reveals Plaintiff's contemporaneous knowledge of the circumstances giving rise to a breach of the underlying Agreement; rather, Plaintiff's responses simply attempt to address Defendant's previously-identified customer complaints, an act that any successful provider of goods or services would perform.  Therefore, the Court rejects Defendant's waiver argument.

The Court finds that there remains a genuine issue of material fact as to whether Defendant's written communications to Plaintiff should have made Plaintiff aware of Defendant's intention to invoke the notice-and-cure provision in Article 3(C)(2) of the

---

[19]To support its waiver argument, Defendant heavily relies upon the Fourth Circuit's opinion in *Little Beaver Enter. v. Humphreys Ry., Inc.*, 719 F.2d 75 (4th Cir. 1983).  *Little Beaver*, however, is only minimally significant here because it analyzes an admiralty contract, which is governed by federal maritime law, not state contract law.  *See Kossick v. United Fruit Co.*, 365 U.S. 731, 738–39 (1961).  Additionally, to the extent it does analyze state contract law principles, it interprets Virginia state contract law, not West Virginia state contract law.

Agreement. Therefore, Plaintiff's Motion on Count One is **DENIED**, and Defendant's Motion

on Count One is **DENIED**.

### B. Count Two

In Count Two, Plaintiff alleges that Defendant never gave effective notice to terminate

the automatic renewal provision of the warehouse services component of the Agreement, set

forth in Article 3(B).[20] According to Plaintiff, the only evidence Defendant can identify as

written notice of its intention not to renew the warehouse services component of the Agreement

is the Termination Letter. Plaintiff, however, asserts that the Termination Letter did not cancel

effectively the warehouse services component of the Agreement, and that such services

automatically renewed on February 28, 2005[21] for an additional one-year term, or through

February 28, 2006. Furthermore, Plaintiff maintains that on February 28, 2006, the term again

automatically renewed through February 28, 2007 because Defendant never provided written

notice of its intent to terminate the warehouse services component with twelve months advance

notice. Accordingly, Plaintiff concludes that Defendant is liable to Plaintiff for breach of

contract regarding the Agreement's warehouse services component.

Defendant retorts with three arguments. First, Defendant contends that the Agreement

eliminated Defendant's minimum monthly storage fee and Plaintiff's minimum storage

---

[20]Article 3(B) of the Agreement provides that, in the event Defendant cancels the handling services component of the Agreement, the warehouse services component will extend for an additional one-year term "automatically unless [Defendant] gives to [Plaintiff] written notice of intent to terminate at least twelve (12) months prior to the end of each term."

[21]After the initial ten-year term of the Agreement expired, the contracting parties or their assignees extended the Agreement by formal, written amendment on two separate occasions; the first amendment extended the Agreement through February 29, 2004, and the second amendment extended it through February 28, 2005.

guarantee after cancellation of the handling services component.  Second, Defendant claims that Plaintiff's material breaches of the Agreement relieved Defendant of any subsequent liability. And third, Defendant insists that the warehouse services component of the Agreement expired, at the latest, in February 2006 because Defendant removed all of its product from Plaintiff's warehouse before February 28, 2005.[22]

Initially, the Court will address Defendant's assertion that Plaintiff's material breaches of the Agreement relieved Defendant of any subsequent liability.  Under West Virginia law, a party who materially breaches a contract cannot recover for the other party's subsequent breach.  *See Milner Hotels, Inc. v. Norfolk & Wester Ry. Co.*, 822 F. Supp. 341, 345 (S.D. W. Va. 1993) ("The cases establish that, under West Virginia law, a party who sues for damages for breach of contract must show his own compliance with the contract or that he was prevented or relieved from compliance by the defendant.") (citations omitted); *see also Jones v. Kessler*, 126 S.E. 344, 350 (W. Va. 1925) ("The rule is strict and inflexible that a plaintiff has no right of action for damages for breach of contract, where he himself has breached the contract.") (internal citation omitted).[23]  Here, Defendant's argument that Plaintiff breached the Agreement when it failed to maintain the warehouse "in such a manner to reduce risk of loss, damage or contamination to [Defendant's] product, equipment, or packaging materials,"[24] is unavailing.  Pursuant to the

---

[22]All of Defendant's arguments to Count Two, aside from its affirmative defense that Plaintiff materially breached the Agreement, address the issue of damages, not liability.

[23]Defendant also relies upon *Teller v. McCoy*, 253 S.E.2d 114 (W. Va. 1978), a West Virginia Supreme Court landlord-tenant decision holding that a landlord's breach of the warranty of habitability, "upon which the vitality of the lease depends, would entitle the lessee to rescind the lease, to vacate the premises and to be relieved of any further rental obligation." *Id*. at 385–86.

[24]This language is included on the list of service standards in Schedule B.

Agreement, Defendant's remedy for Plaintiff's alleged breach was to invoke the notice-and-cure provision of Article 3(C)(2), not to rescind the entire Agreement.  *See Iafolla*, 250 S.E.2d at Syllabus ¶ 4.  For that reason, Defendant's argument that Plaintiff's material breach of the Agreement relieved Defendant of any subsequent liability fails.

Because Defendant does not appear to dispute liability under Count Two, the Court next discusses the amount of damages Defendant owes Plaintiff.  Under Article 3(C)(3), the warehouse services component "shall become a rental agreement between [Defendant] and [Plaintiff], when the Handling provision of this Agreement has been cancelled . . . [and Defendant] shall pay [Plaintiff] an agreed to monthly rental fee not to exceed $60,000 per month."  Also, Article 7(C) of the Agreement provides:

> For the purpose of determining the monthly storage charge, [Plaintiff's] monthly storage guarantee will not apply during any period after written notice of intent to cancel this Agreement under Article 3 (Term of Agreement), Paragraph C, is received by either party, the charge will be determined by actual net product inventoried thereby eliminating the minimum monthly storage charge of $60,000 derived by applying the Schedule A storage rate to 30 million net pounds of product.

These are the only sections of the Agreement that reference any fees or charges Plaintiff may assess to Defendant after the handling services component is cancelled.  Neither provision sets forth a definitive amount that Plaintiff will charge Defendant.[25]  In fact, the closest the Agreement comes to setting a monthly fee is in Article 3(C)(3), which states that the "monthly rental fee [is] *not to exceed* $60,000 per month."   But because the Court finds that language not

---

[25]Plaintiff insists that the "minimum monthly storage charge" in Article 7(C) is separate and distinct from the "monthly rental fee" in Article 3(C)(3).  According to Plaintiff, the "monthly rental fee" is charged to Defendant after the handling services component ends.

specific enough to entitle Plaintiff to an award of $60,000 per month after February 2005, it cannot issue such a judgment at this stage of the litigation.

Finally, the Court finds that Plaintiff's damages in Count Two did not accrue beyond February 2006.  As stated, the Agreement provides that the warehouse services component will automatically renew for a one-year term "unless [Defendant] gives to [Plaintiff] written notice of intent to terminate at least twelve (12) months prior to the end of each term."  Agreement, at Art. 3(B).  Obviously, the Termination Letter does not serve as effective written notice of Defendant's intent to terminate the warehouse services component because it does not comply with Article 3(B)'s time requirement; the Termination Letter was sent on November 9, 2004,[26] and, pursuant to the parties' second amendment, the warehouse services component of the Agreement was scheduled to run through February 2005.  Accordingly, the warehouse services component automatically renewed through February 2006.  Nevertheless, both parties agree that Defendant removed all of its product from Plaintiff's warehouse before February 28, 2005.  Thus, the Court finds that the combination of the Termination Letter and Defendant's subsequent removal of its product from Plaintiff's warehouse before February 28, 2005 gave Plaintiff adequate notice that Defendant did not intend to renew the warehouse services component of the Agreement beyond February 2006.

In accordance with the Court's ruling, Plaintiff's Motion on liability as to Count Two is **GRANTED**, and Defendant's Motion on Count Two is **GRANTED** in part and **DENIED** in part.  Plaintiff still must prove the amount of damages to which it is entitled under Count Two,

---

[26]The precise language in the Termination Letter stated, "KRATON must now invoke the termination provisions of Article 3C and 7C of the Warehousing Agreement and give notice of our intent to terminate this Agreement effective February 11, 2005."

but it may not seek damages for any period beyond February 2006.

### C.  Plaintiff's Remaining Claims

Defendant argues that it is entitled to summary judgment on Plaintiff's remaining claims against it in the Complaint because they are derivative of, and contingent upon, Counts One and Two.  Plaintiff's third claim for relief in the Complaint alleges that Defendant is liable for damages on account.  Plaintiff's fourth claim for relief in the Complaint requests declaratory relief with respect to the substantive allegations in Counts One and Two.  For the reasons provided above, Counts One and Two survive summary judgment.  Therefore, Defendant's Motion with respect to Plaintiff's remaining claims is **DENIED**.

### D.  The Counterclaim

Defendant also claims it is entitled to judgment as a matter of law on the Counterclaim, alleging that Plaintiff is liable to Defendant under the Agreement for damages to Defendant's product.[27]  Under Article 5(A) of the Agreement,

> [Plaintiff shall be responsible . . . for loss of, damage to, or contamination of [Defendant's] Products, equipment and packaging materials occurring during the receipt, unloading, storing, handling, transferring, or loading thereof in the performance of this Agreement, provided that such loss, damage or contamination results from failure of [Plaintiff], its' employees, agents, or contractors, to exercise the degree of care in regard to such products, equipment and packaging materials that a reasonably careful person would exercise under the circumstances[.][28]

---

[27]In response, Plaintiff discusses West Virginia's state law of bailment.  In this case, however, the language of the Agreement addresses squarely the parties' bailment obligations, so the Court need not analyze West Virginia bailment law.

[28]Alternatively, Defendant alleges that Plaintiff is liable to it for damages to Defendant's product, pursuant to Article 5(A)(b) of the Agreement, which makes Plaintiff liable for any damages to Defendant's products "to the extent said products are covered by insurance, other

21

As evidence to support its entitlement to summary judgment, Defendant points to

Layland's May 5, 2004 e-mail to Branch, where Branch allegedly admitted fault:

> All of the standing water observed during your inspections was due to seepage through the exterior wall. . . .  This condition readily worsened last year.  This is probably due to deterioration of the exterior painted surface.  A contractor was secured to correct the problem but failed to complete his program.  We are completely at fault for not forcing [a] more timely solution.

That same e-mail goes on to explain:

> Excessive damage to your product is inexcusable and will never happen again.  The entire warehouse staff and the management of these companies, is deeply embarrassed that conditions had deteriorated to the point [where] product integrity was compromised.  We collectively believe that this was not due to a lack of management's high expectations.  Hopefully, we believe it was due to staff shortages, high activity and not adequate marshalling of our resources to maintain quality standards.  We are also firmly convinced that none of us were paying attention to conditions and opportunities for improvement.

The content of Layland's May 5, 2004 e-mail communication, in which Plaintiff

essentially admits fault for the damages to Defendant's product, is sufficient to establish

Plaintiff's liability under Article 5(A) of the Agreement.  The evidence Defendant offers to prove

the measure of damages on the Counterclaim, however, which only consists of a Kraton-

prepared document summarizing alleged damages to Defendant's product that Plaintiff's actions

caused, is insufficient to establish Defendant's damages.  Accordingly, Defendant's Motion with

respect to the Counterclaim is **GRANTED** in part and **DENIED** in part.  Plaintiff's own May 5,

2004 e-mail proves its liability under the Counterclaim, but Defendant has not proved adequately

---

than warehousemen's legal liability insurance, purchased by the warehouse[.]" Defendant, however, does not submit any evidence to prove any of its products were covered by any such insurance.  Thus, Defendant's argument under Article 5(A)(b) of the Agreement fails.

the amount of damages to which it is entitled.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part, and Defendant's Motion is **GRANTED** in part and **DENIED** in part.

In Count One, the Court finds that Defendants delivered the contractually required notices properly, but that a genuine issue of material fact remains as to whether those notices were sufficient substantively to make Plaintiff aware of Defendant's intention to invoke the notice-and-cure provision in Article 3(C)(2) of the Agreement.

In Count Two, the Court finds that Plaintiff has proved that Defendant is liable for damages up to February 2006, but not for damages beyond that month.

In the Counterclaim, Defendant has proved Plaintiffs' liability, but has not proved the amount of damages Plaintiff owes it.

**IT IS SO ORDERED.**


   **_/s/ Algenon L. Marbley_____**
   **ALGENON L. MARBLEY, JUDGE**
   **United States District Court**

**DATE: July 11, 2006**