IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| HYPERLOGISTICS GROUP, INC., | : |
| Plaintiff, | : Case No. 05-CV-728 |
| v. | : JUDGE ALGENON L. MARBLEY |
| KRATON POLYMERS U.S. LLC, | : Magistrate Judge King |
| Defendant. | : |

**OPINION AND ORDER**

**I. INTRODUCTION**

This matter is before the Court on Plaintiff Hyperlogistics Group, Inc.'s Motion to Reconsider, Alter or Amend Judgment. Pursuant to Rule 59(e), Plaintiff has asked this Court to amend the Court's Order granting partial summary judgment to Defendant Kraton Polymers U.S., LLC. For the following reasons, Plaintiff's Motion to Alter or Amend Judgment is **DENIED**.

**II. BACKGROUND**[1]

On July 1, 1991, Shell Chemical Company ("Shell") entered into a Warehousing Agreement (the "Agreement") with Transdistribution/WV, Inc. ("Transdistribution") for receipt, storage, handling, and shipment of Shell's polymer products at Transdistribution's warehouse facility located on Rosemar Road in Vienna, West Virginia. Under Article 2 of the Agreement,

---

[1]The background information set forth below is, in large part, adopted from the Court's opinion dated July 11, 2006.

1

Transdistribution agreed to provide "the necessary equipment, facilities, space, manpower, administration/office support and services...for receiving, transferring, and storing products consigned by Shell to the care of [Transdistribution] and for performing quality inspections and shipping the products from storage when and as specified by Shell."

The Agreement was effective for a term of ten years, beginning on the signing date, and beyond the initial ten-year term, it gave Shell the option of obtaining one-year extensions. In 2000, Shell assigned its interests under the Agreement to an entity that was later renamed Kraton ("Defendant"). Transdistribution later transferred its interests under the Agreement to Hyperlogistics ("Plaintiff").

Pursuant to Article 15 of the Agreement, West Virginia state law governs any disputes arising under the Agreement.

1. Cancellation Procedures Under the Agreement

Article 3(c) of the Agreement provides the procedure for terminating Plaintiff's handling obligations (the "handling services component"), as distinguished from Plaintiff's warehousing obligations (the "warehouse services component"), under the Agreement. It provides:

> The Handling provision of this Agreement may be cancelled during the term of this contract by [Defendant] when service standards, as outlined in the attached Schedule B, are not being met. The cancellation procedures shall be:
>
> (1) Written notice listing specific service standards not being met shall be delivered by [Defendant] to [Plaintiff] according to paragraph fourteen (14).
>
> (2) On receipt of notice listing service standards not being met, [Plaintiff] has sixty (60) days to issue and implement a corrective action plan. If after sixty (60) days the service standards are not corrected, [Defendant] may give to [Plaintiff] a three (3) month, written notice of intent to

> terminate the Handling provisions of this Agreement. The termination shall take effect three (3) months after receipt of the notice. During this three (3) month period, [Plaintiff] will continue to provide normal services as outlined in this contract.
>
> (3) This [Agreement] shall become a rental agreement between [Defendant] and [Plaintiff], when the Handling provision of this Agreement has been cancelled... [Defendant] shall pay [Plaintiff] an agreed to monthly rental fee not to exceed $60,000 per month.
>
> (4) Other fees and terms shall be negotiated during the three months following the receipt by [Plaintiff] of the written notice of intent to terminate the Handling provision.

Additionally, Article 7(c) of the Agreement provides the following:

> For the purposes of determining the monthly storage charge, [Plaintiff's] monthly storage guarantee will not apply during any period after written notice of intent to cancel this Agreement under Article 3 (Term of Agreement), Paragraph C, is received by either party, the charge will be determined by actual net product inventoried thereby eliminating the minimum monthly storage charge of $60,000 derived by applying the Schedule A storage rate to 30 million net pounds of product.

2. <u>Responsibility for Loss, Damage, or Contamination of Defendant's Products Under the Agreement</u>

The Agreement further provides that Plaintiff shall be held financially liable for certain damages to Defendant's products. In particular, Article 5(A) states:

> [Plaintiff] shall be responsible: (a) for loss of, damage to, or contamination of [Defendant's] Products, equipment and packaging materials occurring during the receipt, unloading, storing, handling, transferring, or loading thereof in the performance of this Agreement, provided that such loss, damage or contamination results from failure of [Plaintiff], its' employees, agents, or contractors, to exercise the degree of care in regard to such products, equipment and packaging materials that a reasonably careful person would exercise under the circumstances; [and] (b) for all loss of, damage to, or

>contamination of [Defendant's] products occurring during the performance of this Agreement, to the extent said products are covered by insurance, other than warehouseman's legal liability insurance, purchased by [Plaintiff], whether or not such loss or damage has resulted from the failure of [Plaintiff], its' employees, agents, or contractors, to exercise the degree of care specified in subparagraph (a), above...

### 3. Defendant's Actions to Cancel the Agreement

According to Defendant, beginning in 2002, the condition of Plaintiff's warehouse began to decline, and Plaintiff's inventory and record keeping practices became disorganized. During a series of meetings between July 1, 2003 and August 12, 2003, representatives from Plaintiff and Defendant met to discuss Plaintiff's alleged unsatisfactory performance. Subsequently, Plaintiff presented to Defendant its remedial plan to address the deficiencies Defendant had identified.

On March 25, 2004 and April 2, 2004, Defendant conducted audits of Plaintiff's warehouse. In the audits, Defendant discovered additional issues regarding the warehouse's maintenance and condition. For example, the auditors found entire rows of product damaged or ruined by moisture and standing water, products crushed due to improper stacking, punctured and leaking products, and products spilled onto the warehouse floor. Defendant provided Plaintiff with the auditors' written reports, and on April 12, 2004, Sherri Bartimus ("Bartimus"), one of Plaintiff's employees, responded to Defendant by submitting a "Hyperlogistics Warehouse Audits Plan of Action," which sought to correct flooding and re-stacking issues.

On April 27, 2004, John Branch ("Branch"), Defendant's national logistics manager, sent a letter to Seatta Layland ("Layland"), Plaintiff's President, requesting additional corrective action and "root cause analysis" by Hyperlogistics. In the letter, Branch identified the problem standing water posed to Defendant's products and provided instructions on how to avoid

4

damaging Defendant's product by decreasing levels of humidity in the warehouse. Branch's letter, in part, stated:

> The excessive damage to pallets, boxes, bags, and lack of centering pallets during warehouse handling all relate back to employee attitude and an atmosphere of quality expectations. All the warehouse staff need to be informed that rough handling of the pallets will not be tolerate. Care is to be exercised when moving and stacking the pallets and that is a minimum expectation. If a high level of expectations is set forth by management, then employees will rise to that level. We consider this to be a major issue at [the warehouse] today.

Layland responded to this letter by email on May 5, 2004, stating that Defendant's observations were "well founded." With respect to the standing water issue, Layland responded:

> All of the standing water observed during your inspections was due to seepage through the exterior wall...This condition readily worsened last year. This is probably due to deterioration of the exterior painted surface. A contractor was secured to correct the problem but failed to complete his program. We are completely at fault for not forcing [a] more timely solution.

In response to Defendant's other statements, Layland noted:

> Excessive damage to your product is inexcusable and will never happen again. The entire warehouse staff and the management of these companies, is deeply embarrassed that conditions had deteriorated to the point [where] product integrity was compromised. We collectively believe that this was not due to a lack of management's high expectations. Hopefully, we believe it was due to staff shortages, high activity and not adequate marshaling of our resources to maintain quality standards. We are also firmly convinced that none of us were paying attention to conditions and opportunities for improvement.

On June 2, 2004, Bill Reinke ("Reinke"), one of Defendant's employees, e-mailed another letter to Layland and Geoff Manack ("Manack"), Plaintiff's Vice-President, detailing aspects of the warehouse that were still inadequate. In the e-mail, Reinke commented that "the

5

problems we found, especially with customer orders, indicate that simple guidelines are still not being executed." On June 16, 2004, Bartimus responded by e-mail to Reinke, Branch, and some other Kraton employees that "upon your next audit, you will find that the conditions at our facility will meet [Kraton's] requirements." Bartimus assured Defendant that Plaintiff had implemented additional corrective actions to resolve Defendant's concerns.

On August 25, 2004, Defendant concluded another inspection of Plaintiff's warehouse, and again, it was dissatisfied with the warehouse's handling of Defendant's product. According to Defendant, the inspection revealed that, "of the roughly 700 units of KRATON product stored at the warehouse, over 500 units were damaged and in need of repair." Additionally, Defendant contends that, out of 146 units inspected on July 29, 2004 alone, 86 units were damaged and in need of repair, and 54 units were unacceptable for customer shipment under any condition.

After reviewing the results of the August 2004 inspection, Branch mailed a letter to Layland, dated November 9, 2004, to inform Plaintiff of Defendant's intent to cancel the handling provision and terminate the Agreement (the "Termination Letter"). The final three paragraphs of the Termination Letter state:

> Since 2003, we have provided Hyperlogistics with numerous written and verbal notices of performance and service problems. These notices have been acknowledged and corrective action plans were prepared, submitted, and supposedly implemented. Kraton has given Hyperlogistics over fifteen months to correct the service and performance problems since the original August 2003 corrective action plan was submitted, yet serious service problems continue.
>
> The service standards, as required in Schedule B of the [Agreement], dated July 1, 1991, have not been met, therefore Kraton must now invoke the termination provisions of Article 3C and 7C of the Warehousing Agreement and give notice of our intent to terminate this Agreement effective February 11, 2005.

> In addition, pursuant to Article 5 of this Agreement, we hereby submit a claim for damages in the amount of $254,953.15. The details of the claim are set forth in Attachment B [to this letter]. We suggest that Kraton be issued a credit for services to be provided in accordance with Article 7© during the remaining three (3) months of the Agreement as partial payment of the claim.

Defendant continued to pay its storage fees to Plaintiff until it had arranged for the removal of all of its product from Plaintiff's warehouse, which occurred prior to February 28, 2005. Thereafter, Defendant ceased any payments to Plaintiff.

### B. Procedural History

Plaintiff filed a complaint against Defendant and others[2] in the Court of Common Pleas for Franklin County, Ohio on June 30, 2005 (the "Complaint"). The Complaint alleges four claims for relief against Defendant: (1) that Defendant breached the handling services component of the Agreement ("Count One"); (2) that Defendant breached the warehouse services component of the Agreement ("Count Two"); (3) that Defendant is liable to Plaintiff for $253,279.38 on account; and (4) that Plaintiff is entitled to a declaratory judgment that Defendant has failed to terminate the Agreement in any respect.[3]

Defendant removed this action to federal court on the basis of diversity jurisdiction on July 28, 2005. On September 6, 2005, Defendant filed an answer to the Complaint and asserted a counterclaim, which alleges that Plaintiff is liable to Defendant under the Agreement for damages to Defendant's product (the "Counterclaim").

On January 6, 2006, Plaintiff filed a Motion for Partial Summary Judgment on Counts

---

[2] Plaintiff's complaint named 25 John Doe defendants.

[3] Plaintiff also alleges a fifth claim against the 25 John Doe defendants for tortious interference with contractual relations.

One and Two of the Complaint ("Plaintiff's Motion").  Defendant timely filed a Memorandum in Opposition to Plaintiff's Motion, and Plaintiff filed a Reply Memorandum.

On February 16, 2006, Defendant filed a Motion for Summary Judgment on all of Plaintiff's claims against Defendant and on the Counterclaim ("Defendant's Motion").  Plaintiff timely filed a memorandum in Opposition to Defendant's Motion, and Defendant filed a Reply Memorandum.

On February 16, 2006, Defendant filed a Motion for Summary Judgment on all of Plaintiff's claims against Defendant and on the Counterclaim.  Plaintiff timely filed a memorandum in Opposition to Defendant's Motion, and Defendant filed a Reply Memorandum.

On July 11, 2006, the Court granted Plaintiff's Motion in part and denied it in part.  As to Count One, the Court found that Defendant delivered the contractually required notices properly, but that a genuine issue of material fact remained as to whether those notices are sufficient substantively to invoke the notice-and-cure provision in Article 2(C)(2) of the Agreement.

As to Count Two, the Court granted summary judgment for the Plaintiff and held that the Defendant was liable to the Plaintiff for violating the warehouse services component of the Agreement.  The Court also held that damages may only be assessed through February 2006 because at that point Plaintiff had constructive notice of the Defendant's termination of the warehousing portion of their contract.

Last, the Court granted summary judgment to Defendant on its Counterclaim on the issue of liability.  The Court held that Layland's May 5, 2004 email sufficiently established that Plaintiff was liable for damage to Defendant's goods, but that Defendant did not adequately prove the amount of damages to which it is entitled.

On July 21, 2006, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Plaintiff filed a Motion to Alter or Amend Judgment based upon the Court's decision to grant partial summary judgment on Defendant's Counterclaim.  On August 4, 2006, Defendant filed a reply memorandum in opposition to Plaintiff's Motion to Alter or Amend Judgment.

On December XX, 2006, the Court denied Plaintiff's request  Accordingly, Plaintiff's Motion to Alter or Amend Judgment is ripe for decision.

### III.  STANDARD OF REVIEW

A Motion to Alter or Amend Judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure serves a limited purpose and should be granted for one of three reasons: (1) an intervening change in controlling law; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice. *General Truck Drivers, Chauffeurs, Warehousemen & Helpers, Local Union No. 957 v. Dayton Newspapers, Inc.,* 190 F.3d 434, 445 (6th Cir. 1999), *citing Javetz v. Board of Control, Grand Valley State University*, 903 F. Supp. 1181, 1190 (W.D. Mich. 1995).

In determining whether clear error exists, the Court must consider whether "it is left with the definite and firm conviction that a mistake has been committed."  *Easley v. Cromartie,* 532 U.S. 234, 242 (2001), quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948).  Moreover, where a party is "simply seeking a second bite of the apple in bringing [a] motion to amend...[and] makes the same argument as it did at the summary judgment stage and fails to set forth any meritorious errors of law," the party's Motion to Alter or Amend Judgment should be denied.  *Id.*

### IV.  ANALYSIS

Plaintiff asserts that this Court should modify its decision to grant partial summary judgment in favor of Defendant on its Counterclaim. Specifically, Plaintiff argues that the Court erred as a matter of law in finding that Plaintiff is liable for the damage to Defendant's products. In support of its Motion to Alter or Amend Judgment, Plaintiff makes two arguments.

First, Plaintiff argues that it was an error of law for the Court to overlook Layland's affidavit[4] when determining Plaintiff's liability for the damage to Defendant's products. Plaintiff contends that the statements contained in Layland's affidavit present evidence to refute Defendant's assertion that Plaintiff acknowledged that it's failure to exercise reasonable care resulted in damage to Defendant's products. Specifically, Plaintiff argues that Layland's affidavit asseverates that his comments in the May 5, 2004 email communication to Branch were not intended as admissions of liability but instead were attempts to maintain good customer relations. Plaintiff asserts, at the very least, that Layland's statements create a genuine issue of material fact as to whether Plaintiff truly acknowledged fault in any way, which should have precluded summary judgment on the matter of Plaintiff's liability. Plaintiff claims that the Court's failure to consider Layland's affidavit was an error of law which merits an amendment to the judgment rendered.

Plaintiff is not entitled to an amended judgment based upon its first argument. When determining summary judgment on the issue of Plaintiff's liability for damage to Defendant's products, the Court examined Layland's May 5, 2004 e-mail and found that it "essentially admits fault for the damages to Defendant's product [and] is sufficient to establish Plaintiff's liability."

---

[4] In her affidavit, Layland stated that the May 5, 2004 e-mail communication to Branch was not an admission of liability or failure to exercise reasonable care, but rather an attempt to maintain a good working relationship with one of Plaintiff's customers.

10

*Hyperlogistics Group, Inc. v. Kraton Polymers U.S. LLC,* 437 F. Supp. 2d 735, 749 (S.D. Ohio 2006).  The Court, after reviewing all of the motions, affidavits, and substantial oral argument, found that the statements in Layland's May 5, 2004 e-mail were, on their face and standing alone, sufficient to support the conclusion that Plaintiff is liable to Defendant for damage to its products.  The fact that Layland's affidavit asserts an ex-post explanation for her statements in this email does not negate the fact that she admitted her company's direct liability in the email.  The content of Layland's email speaks for itself, and does so in great detail; it even admits that "seepage through the exterior wall" contributed to the damage of Defendant's products and that Plaintiff was "completely at fault for not forcing [a] more timely solution."  *See* Exhibit A to Hyperlogistics' Motion for Reconsideration.

Upon review, this Court does not have a definite and firm conviction that a mistake occurred and, therefore, holds that it committed no clear error of law when in ruling in favor of the Defendant on its Motion for Summary Judgment.  Moreover, since Plaintiff originally presented this Court with Layland's affidavit to refute Defendant's assertion that Plaintiff repeatedly acknowledged its own liability, in essence, Plaintiff is using a Motion to Alter or Amend Judgment to achieve a second bite of the apple by reasserting the same argument it presented at the summary judgment stage.

Second, Plaintiff argues that the May 5, 2004 email communication, upon which the Court rested its determination of Plaintiff's liability, itself, created a question of material fact as to Plaintiff's liability.  As a result, Plaintiff contends that the Court's failure to recognize the question of material fact in the e-mail communication was an error as a matter of law.

Plaintiff refers to language in Layland's May 5, 2004 e-mail which denied any past

humidity problems in the building. Plaintiff further argues that, in her e-mail, Layland denied that Defendant ever properly advised Plaintiff of a humidity threshold. Plaintiff asserts that there has never been a determination as to what, if anything, caused the damage to Defendant's products. Thus, Plaintiff contends that a question of material fact exists as to whether any portion of the damage is the result of humidity and ultimately whether Plaintiff is liable at all.

Plaintiff is not entitled to an amended judgment based upon its second argument. The Court finds that this argument merely replicates the same argument presented at the summary judgment stage and in its previous argument above, namely, that a question of material fact exists as to Plaintiff's liability. Plaintiff again fails to present this Court with any meritorious error of law that would support an amendment to the Court's finding that a question of material fact does not exist and that Plaintiff is liable for damage to Defendant's products.

The Court, after reviewing all of the relevant evidence, including Layland's May 5, 2004 e-mail in which she acknowledge that Hyperlogistics' was "completely at fault" for damage to Defendant's goods, concluded that Plaintiff is liable for damage to Defendant's product. *See* Exhibit A to Hyperlogistics' Motion for Reconsideration. This Court does not hold a definite and firm conviction that a mistake occurred when reaching such a conclusion, and therefore rejects Plaintiff's attempt to have a second bite at the apple by rearguing an issue previously decided by this Court. Accordingly, the Court rejects Plaintiff's second argument. Since they have failed to meet their burden under Rule 59(e), Plaintiff's Motion to Alter or Amend Judgment is **DENIED**.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Alter or Amend Judgment is **DENIED**.

**IT IS SO ORDERED.**

    s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATED: December 4, 2006**